# EXHIBIT 34

AGN. NO._____

MOTION BY SUPERVISORS SHEILA KUEHL AND HILDA L. SOLIS          April 30, 2019

**ASSESSING COUNTY LIABILITY IN SETTLEMENTS INVOLVING SHERIFF "GANGS"**

This past February, seven East Los Angeles Station (ELA) Sheriff's Deputies filed

a multimillion dollar lawsuit against the County of Los Angeles, alleging that several

members of the Banditos, an ELA station tattoo group or Sheriff "gang," viciously beat

them up during an informal party when they were new recruits, as a way of ensuring

their adherence to a "code of silence." One deputy was knocked unconscious,  and

another choked to point of suffocation ("*L.A. County Deputies Claim Abuse by an East

L.A. Sheriff's Station 'Gang',"* Joel Rubin, March 7, 2019 Los Angeles Times). This is the

second lawsuit filed against the County alleging abusive conduct by the Banditos: In

2014, the county paid a $1.5 million dollar settlement to a 10 year veteran female deputy

assigned to ELA, in which she claimed that members of this gang "sexually harassed,

threatened and demanded sex from her" as part of "training." According to the lawsuit,

after she  declined these advances, further harassment, hazing, and other forms of

retaliation ensued, including being run off the road by another deputy, being slammed

into a wall while she held a loaded shotgun, and having a dead rat placed under her car

MOTION

Solis          _____

Ridley-Thomas          _____

Kuehl          _____

Barger          _____

Hahn          _____

Plaintiff's Summary Judgment Exhibit No. 34

after she reported the group's behavior.  This deputy also alleged observing favors

being demanded from other female probationary deputies, including in one case, a

trainee being asked to write arrest reports "that were essentially fabricated" ("*Members

Of Deputy 'Gang' Reportedly Put Other LA County Sheriff's Deputies In Hospital After

Off-Duty Brawl,"* Celeste Fremon, Witness LA, October 5, 2018).

The Banditos are not the only such Sheriff or station group named in multi-million

dollar lawsuits alleging deputy misconduct.  In 2018, the County settled a lawsuit for

$1.5 million dollars, in part because one deputy had likely committed perjury when he

denied that he was a member of an LASD tattoo group known as the Regulators ("*L.A.

County Sheriff's Department Pays Price as Clandestine Deputy Cliques Persist,"* Maya

Lau, October 27, 2018, Los Angeles Times).

The Los Angeles County Sheriff's Department (LASD or the Department) has a

long and troubled history involving unauthorized, exclusive and secretive Department

groups consisting of sworn deputies, whose membership is based on a variety of

factors, including station or unit assignment, ethnicity, involvement in excessive uses of

force, intimidation of fellow deputies, and harassment and even shootings of civilians.

Many of these groups are known for their identical, hidden, sinister tattoos, and have

been the subjects of investigations, lawsuits and settlements involving excessive uses of

force, violence and dishonesty, against other Sheriff's Deputies, as well as against

members of the community. These groups of deputies, whose existence is not officially

sanctioned by the Department, are variously referred to as "cliques," "violent cliques,"

"tattoo groups,"  "station groups," "secret deputy sub-groups," and "secret societies."

Reports of intimidating, gang-like behavior, such as aggressive member self-

identification, use of street-gang lingo, flashing hand signals, and violence in the

communities they serve, have led many to compare these groups to street gangs, and identify them as Sheriff's gangs.  Over the past several years, the violent, lawless conduct of many of these group members has led to investigations, disciplinary actions, damage claims, lawsuits and settlements reaching into the millions of dollars.

The first such identified  LASD group, in 1971, the Little Devils, consisted overwhelmingly of white officers who patrolled a community (East Los Angeles) primarily populated by Latinos and African-Americans. Throughout the 1980's, these groups, then dominated by white deputy sheriffs, proliferated in Sheriff's stations in Latino and African-American communities; the Vikings were one such group, with a tattoo that carried an overt reference to officer involved shootings. In a 1990 federal lawsuit involving LASD deputy misconduct, 9th Circuit District Court Judge Terry Hatter declared that the Vikings were essentially  running a "neo-Nazi, white supremacist gang" within the Lynwood station. In 1996, LASD paid out approximately $9 million dollars in damages related to lawsuits involving the Vikings ("*The Secret Society Among Lawmen,*" by Tina Daunt, Los Angeles Times, March 24, 1999).

The 1992 Kolts Commission on police brutality in Los Angeles found that groups consisting mostly of white deputies, such as the Vikings, the Grim Reapers (Lennox Station), the Regulators (Century Station), and the Jump Out Boys (Operation Safe Streets Gang Enforcement Team) were particularly predominant in areas with large minority populations.

The presence of violent, gang-like groups within the Department has not been limited to the patrol division. Department custody gangs such as the 2000 Block and 3000 Block (also known as the 2000 Boys and the 3000 Boys) were deeply involved in excessive uses of force in the jails, which played a role in precipitating a federal

Department of Justice lawsuit whose provisions and orders are still in effect today.

Department management has known of the existence of these two groups at Men's

Central Jail ("MCJ") since at least 2004, "if not earlier" ("*Report of the Citizen's*

*Commission on Jail Violence,"* 2012, pp. 67, 102). These two groups identified

themselves by jail floor assignment, in this case, the 2nd and 3rd floors of MCJ. The Los

Angeles Times reported in 2012 that deputies assigned to the 3rd floor of the jail had a

higher number of use-of-force incidents against inmates during a recent four-year period

than those assigned to any other floor at MCJ ("*Los Angeles County Sheriff May Shut*

*Down Part of Men's Central Jail,"* Jack Leonard and Robert Faturechi, Los Angeles

Times, March 21, 2012).

      Assaults against inmates were not the only activity of the 3000 Boys. In 2011, the

Department disciplined a group of deputies who all worked on the third, or "3000," floor

of MCJ, after the group fought two fellow deputies at an employee Christmas party and

allegedly punched a female deputy in the face, after she attempted to mediate the

dispute. Sheriff's officials later said the men had formed an aggressive "3000" group that

used gang-like three-finger hand signs. A former top jail commander told The Times that

sworn custody staff would "earn their ink" by breaking inmates' bones ("*KTLA*

*Investigation Reveals Existence of Gang-Like Clique Within Men's Central Jail,"* KTLA

News, May 4, 2011). In one episode, a deputy in the 2000 Boys group broke the eye

socket of a "complacent" inmate during a beating to "earn his ink" — a tattoo with the

Roman numeral "II" ("*After Decades of Problems, New Allegations Surface of a Secret*

*Clique within L.A. County Sheriff's Department,"* Maya Lau and Joel Rubin, July 10,

2018).

      This gang-style violence by sworn Deputies is not limited to the jails or to conflicts

between deputies.  In May 2012, discovery of the existence of the Jump Out Boys was due to the accidental discovery of a printed "creed" which stated members would receive a tattoo after being involved in a shooting. The Jump Out Boys, a group of gang enforcement officers, were compared to the lawless Rampart Division of the LAPD in the 1980's, whose members had a similar tattoo: a skeleton holding a revolver. Whenever a deputy in the group was involved in a shooting, he would earn extra ink of smoke coming out of the barrel of the gun ("*Sheriff's Clique May Have Celebrated Shootings with Tattoos,*" Robert Faturechi, Los Angeles Times, May 10, 2012). Seven of the Jump Out Boys members were fired ("*L.A. County Sheriff's Department Intends to Fire Seven Deputies*," Robert Faturechi, Los Angeles Times, February 6, 2013). Four of those were ultimately reinstated.

In 2012, Deputy Gregory Rodriguez, an alleged member of the Banditos, was charged with filing a false police report and committing perjury, stemming from the arrest of Christopher Gray. Rodriguez' claim that Gray was "inciting [the] crowd and threatening deputies" was belied by video that showed Gray "calmly standing" nearby and refusing to move off the sidewalk. Gray was arrested and jailed for five days before the charges were dismissed, causing him to lose his job ("*LA County Sheriff's Deputy Faces Jail Time After Allegedly Filing False Report, Committing Perjury*," CBSLA, June 10, 2015). While Deputy Rodriguez was not convicted, the incident led to the County entering into a $549,000 settlement with Mr. Gray ("*What Is The LA County Sheriff's Department Doing About Its Big, Bad Deputy Gang Problem?*," Celeste Fremon, WitnessLA, October 30, 2018).

The Citizens' Commission on Jail Violence (CCJV), in its comprehensive report addressing dysfunction within the Sheriff's Department, then run by Sheriff Leroy Baca,

noted a culture of tolerance and even "tacit approval" of what the Commission termed "violent cliques" ("*Report of the Citizen's Commission on Jail Violence,*" p. 101). The Commission recommended that the agency ban visible tattoos associated with the groups because they had sometimes been used to reward aggressive behavior.

The CCJV further alleged that Department management "has known about and failed to address the longstanding problem of deputy cliques," and "also has failed to address with appropriate rigor the 'code of silence' that is an inherent concern among law enforcement agencies. It rarely finds or meaningfully punishes dishonesty and failure to report force incidents, and it takes months, (or even years) to address deputy misbehavior."  The twin dysfunctions of secret and unauthorized members-only deputy groups, paired with an intimidating code of silence that denies, ignores or minimizes deputy misconduct, have fostered the toxic dynamic cited in numerous claims, lawsuits and disciplinary actions involving Sheriff tattoo groups or gangs.

Unfortunately, LASD management through the years has not been particularly effective in investigating, or thwarting the rise of sheriff gangs, and this ambivalence has likely enabled their continuation and expansion. Sheriff Baca vowed to address the problem, but as it turned out, he and some of his executive team were instrumental in creating the conditions that actually contributed to the uses of excessive force and the code of silence, tactics much favored by these groups. The culture within these groups enforced their code of silence, and made investigation difficult and dangerous.

There was no significant investigation or response in the department during the term of former Sheriff Jim McDonnell.

Recently, Sheriff Alex Villanueva  has acknowledged the problems presented by  these "inter-generational" groups as "hazing run amok," but also has characterized

them as "benign," and at a recent Civilian Oversight Commission meeting, even defined "hazing"  to include working overtime without a jacket, or a rookie having to buy lunch for the entire station. Alarmingly, his sentiments echo those of disgraced and convicted former Sheriff Baca who, in 1999, attributed elaborate matching tattoos to nothing more than a response to "peer pressure," or "heavy drinking." Recent revelations such as those involving the Banditos' violent conduct, or that a recently reinstated Deputy admitted to being a member of the Reapers gang, and apparently used that connection as a means to intimidate his former girlfriend, continue to alarm this Board; these groups are not "benign." Sheriff Villanueva has also forcefully defended his deputies' right to have tattoos, for whatever reason, vigorously maintaining that it is a "private matter." His recent statements avowing to reinstate deputies who have been terminated, and his recent action reinstating one such deputy who used excessive force against an arrestee, heighten this Board's alarm that whatever progress was made under prior leadership will  rapidly evaporate.

It is unacceptable that unauthorized, exclusive self-affiliated groups involving a code of silence and violence be part of the Sheriff's Department. To continue to deny or minimize the impact their existence has on custody and station culture, as well as on the communities these groups serve, is to foment and encourage their growth. Actions of these groups have actively harmed residents of the County, other Sheriff's deputies and have cost the County millions of dollars in lawsuits and settlements.

**WE, THEREFORE, MOVE** that County Counsel, in consultation with the Office of Inspector General, the Civilian Oversight Commission, and other relevant Departments, provide a report back within 90 days, and provide:

1. A chronological list of all claims, lawsuits, and other settlement agreements of

Case 2:20-cv-01691-JFW-AFM   Document 92-11   Filed 08/30/21   Page 9 of 10   Page ID
#:1634

any kind since the year 1990 in which the claim or lawsuit involved allegations
that a sworn member of LASD was a member of a secret society or clique.  This
list should:

a.  Include, but not be limited to cases that went to trial and all claims, lawsuits,
or any settlement of any kind in which County Counsel recommended that the
claim or lawsuit be settled in a CAR document or other proposed settlement
(at least in part) due to a sworn member of LASD being a member (alleged or
proven or acknowledged) of a secret society or clique, or station group or
Sheriff gang.

b.  Include as to each case, the following:

i.  The date and location of the initial incident causing the claim or lawsuit;

ii.  The assignment of the deputy or deputies involved in the incident;
deputies involved may be subjects or witnesses.

iii.  The name of the secret society or clique of which the deputy or deputies
are alleged to be members. The numbers of member deputies involved.

iv.  The proposed or actual settlement amount or verdict award if the case
went to trial.

v.  Whether any Corrective Action Plan created in response to this incident
addressed the violent clique, station group, secret society or Sheriff
gang aspect of the case, including a description of the tattoo, if known.

2.  Membership in a secret society need not be the gravamen of the claim or lawsuit
itself. If any discovery related to any claim or lawsuit or disciplinary action
discusses deputy cliques, secret societies, or station groups or mentions any
such group by its purported name, it would be included. This includes all station

house or specialized unit groups  including, but not limited to, the Vikings, Jump

Out Boys, Reapers, Regulators, Banditos and Spartans and custody groups such

as the 2000 Block and 3000 Block, also known as 2000 Boys and 3000 Boys.

S: NA/Assessing County Liability in Settlements Involving Sheriff "Gangs"