**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

<u>**CIVIL MINUTES -- GENERAL**</u>

Case No.    **CV 20-1691-JFW(AFMx)**                    Date: October 7, 2021

Title:        Estate of Paul Rea, et al. *-v-* County of Los Angeles, et al.

---

**PRESENT:**

      **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

      **Shannon Reilly**                            **None Present**
      **Courtroom Deputy**                        **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
          None                                                        None

**PROCEEDINGS (IN CHAMBERS):**        **ORDER GRANTING DEFENDANTS' MOTION FOR**
                                        **SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,**
                                        **PARTIAL SUMMARY JUDGMENT [filed 8/23/21; Docket**
                                        **No. 76]**

        On August 23, 2021, Defendants County of Los Angeles (the "County"), Los Angeles County Sheriff's Department ("LASD"), Sheriff Alex Villanueva ("Villanueva"), Deputy Hector Saavedra (a/k/a Deputy Hector Saavedra-Soto) ("Saavedra"), and Deputy Argelia Huerta ("Huerta") (collectively, "Defendants") filed a Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Motion").  On August 30, 2021, Plaintiffs Estate of Paul Rea, by and through successor in interest Leah Garcia ("Rea"), Leah Garcia, individually ("Garcia")[1], Jaylene Rea ("Jaylene"), and Tommy Sanchez ("Sanchez") (collectively, "Plaintiffs") filed their Opposition.  On September 3, 2021, Defendants filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument.  The matter was, therefore, removed from the Court's September 20, 2021 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.        Factual and Procedural Background[2]**

---

     [1]  Garcia is the mother of Rea.

     [2]  To the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections.  As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

Initials of Deputy Clerk __sr__

## A.      Factual Background

On June 27, 2019, at approximately 11:00 p.m., Huerta and Saavedra were on patrol in East Los Angeles when they observed a car driving north on Gerhart Avenue that was speeding and failed to stop at a stop sign.  Saavedra ran the car's license plate and the information Saavedra received indicated that the license plate was associated with an Audi.  Neither of the officers saw an Audi emblem on the car, and they knew from their experience with vehicle thefts that criminals typically switch license plates ("cold plate") and remove identification emblems to make it more difficult for law enforcement to determine if a car was stolen.  Based on the car's speed, the running of the stop sign, and the officers' inability to verify the make of the car, the officers decided to conduct a traffic stop.  After they activated the lights on their patrol car, the driver pulled over and stopped.  As the officers approached the car, they could smell burnt marijuana.  Huerta approached the driver, Sanchez, and Saavedra approached the front seat passenger, Rea.  Sanchez and Rea were the only two individuals in the car.

### 1.      Huerta Makes Contact With Sanchez

As Huerta spoke with Sanchez, she observed that Sanchez's eyes were glassy and red and that he was sweating.  In addition, Huerta observed that Sanchez appeared to be nervous and that he would not keep his hands on the steering wheel despite Huerta's repeated instructions to do so.[3]  Sanchez was also generally uncooperative and argumentative, and failed to give Huerta his driver's license when she requested it.  In light of the traffic violation, Sanchez's behavior and appearance, and the smell of marijuana coming from the car, Huerta decided to conduct a field sobriety test on Sanchez.  After Deputy Huerta asked Sanchez to step out of the vehicle multiple times, Sanchez finally stepped out of his vehicle.[4]  Sanchez told Deputy Huerta he had smoked marijuana earlier in the evening and that he had marijuana in his pocket.  Deputy Huerta brought Sanchez to the patrol car and searched him and found and removed the plastic container of marijuana that Sanchez had indicated was in his pocket.  Because Sanchez continued to be uncooperative and argumentative, and appeared very tense and nervous, Huerta handcuffed Sanchez and placed him in the backseat of the patrol car.

### 2.      Saavedra Makes Contact With Rea

While Deputy Huerta was speaking with Sanchez, Deputy Saavedra talked to Rea. According to Saavedra, during a traffic stop, he generally engages the passenger in conversation to keep the passenger occupied in order to reduce the possibility of a conflict during a stop.  During his conversation with Rea, Saavedra observed that Rea could not sit still, repeatedly tried to remove his seatbelt, and attempted to reach for the glove compartment.

---

[3]  While Huerta was talking to Sanchez, she had her weapon unholstered.  According to Huerta, she had her weapon by her side.  According to Sanchez, Huerta had her weapon pointed at his head.

[4]  Although Sanchez testified at his deposition that Huerta "forced" him out of his vehicle, when asked to explain how Huerta forced him out, he testified that "[s]he had opened the door, so I kind of had no choice but to get out the – out of the vehicle."

Initials of Deputy Clerk  _sr_

After Huerta finished searching Sanchez and placed him in the patrol car, Saavedra asked Rea if he would step out of the car, which Rea did.[5]  Saavedra conducted a brief pat down of the back of Rea's waistband and did not feel any weapons.  Saavedra then escorted Rea to the front of the patrol car.  Saavedra asked Rea if he had any weapons and if he was on probation or parole.  Rea repeatedly stated that he did not have any weapons, only a marijuana pipe, and that he was not on probation or parole.

Saavedra asked Rea if he could search him to make sure he did not have any weapons, and Rea consented.  Saavedra stood behind Rea and conducted the search using his right hand to sweep the front of Rea's waistband from left to right.  While he was searching Rea, Rea suddenly and without warning or provocation spun around and violently punched Saavedra in the left temple.  Rea punched Saavedra with such force that it caused Saavedra's knees to buckle, neck to crack, and vision to blur.  Rea then punched Saavedra a second time in the left temple area.  The force of the blows to his head resulted in Saavedra suffering a concussion.  Saavedra, from his position behind Rea, attempted to gain control of Rea by placing his arms around Rea in order to place him in a "bear hug"' hold, and, as he did so, he felt the handle of a gun, which had a thick grip with distinct detail, in Rea's front waistband.  Saavedra tried to pull the gun out of Rea's waistband, but Rea tightened his grip on Saavedra's arm and hand and prevented him from gaining control of Rea's weapon.  Rea escaped from the bear hug, and Saavedra and Rea, who were in very close proximity to each other[6], began moving in a westward direction (to the left) in the area between the patrol vehicle and Sanchez's car.  As they moved, Rea turned toward Saavedra, lifted his shirt, and reached toward his waistband where Saavedra had felt the gun.  At that moment, given their close proximity, Saavedra believed that if Rea pulled his gun from his waistband, he would be shot and killed.  Fearing for his life and with only a split second to react, Saavedra fatally shot Rea.[7]

Rea fell to the ground and landed on his back with his left hand still holding his shirt.  While Rea was on the ground, his body convulsed.  As his body convulsed, his gun, which had slipped down his pant leg, rattled against the pavement.  The entire incident, from Rea's punches to Saavedra's left temple until the time Saavedra fired his weapon at Rea, happened in a matter of seconds.

### 3.    Developments After Saavedra Shot Rea

---

[5]  A CCTV video, which does not include any audio, was obtained from the home located at 306 S. Gerhart Avenue.  The video shows the portion of the incident after Rea gets out of the car and was being searched by Saavedra.  Because of the lights on the roof of the patrol car and the grainy nature of the video, it is impossible to determining exactly what is happening until Saavedra and Rea both move away from the patrol car.  Once Saavedra and Rea are visible, the video clearly shows them struggling in very close physical proximity before Saavedra unholsters his service revolver and fires shots at Rea, who falls to the ground.  The video also very clearly highlights how quickly – mere seconds – these events unfolded.

[6]  From the CCTV video, it appears that during the entire incident Saavedra and Rea were never more than approximately two feet from one another.

[7]  It is undisputed that Saavedra did not warn Huerta that Rea had a gun prior to firing his service revolver.

Initials of Deputy Clerk __sr__

After Saavedra shot Rea, Saavedra, with his service weapon pointed at Rea, shouted at Rea, who was on the ground on his back, "don't fucking move, dude.  Don't fucking move."[8]  Saavedra told Huerta that Rea was "417,"[9] "he has a gun," and "he fucking punched me hard."  Sanchez, who was still in the backseat of the patrol vehicle, testified at his deposition that he heard Saavedra say that Rea had punched him "really hard" and that Saavedra asked Sanchez why Sanchez did not tell Saavedra that Rea had a gun.

Huerta called for backup, and told dispatch that there had been a "998," or officer involved shooting.  According to Huerta, she did not tell dispatch that there was a "417" because Rea was on the ground and not an active threat.  Shortly after she called for backup, other deputies arrived at the scene.  Deputy James Chung ("Chung") conducted a pat down search of Rea and found his gun, a Glock compact .40 caliber pistol, lodged at the bottom of his right pant leg.  Detectives later determined that Rea's gun was a "ghost gun," a build-it-yourself firearm that is assembled from parts and impossible to trace.  Chung moved the gun approximately two feet away from Rea and then began performing chest compressions on Rea until paramedics arrived.  Once paramedics arrived, Rea was transported to the hospital where he was pronounced dead at 11:34 p.m.

Shortly after initial backup arrived, Sergeant Robert Lavoie ("Lavoie") arrived and told Saavedra and Huerta to get in his patrol car.  Saavedra advised Lavoie that his head hurt and that he felt dizzy and disoriented.  As a result of Saavedra's injuries, Lavoie drove Saavedra and Huerta to LAC + USC Medical Center.  While Saavedra was being examined, Lieutenant Hugo Reynaga arrived at LAC + USC Medical Center and drove Huerta to East Los Angeles Station.  Doctors at LAC + USC Medical Center determined that Saavedra had suffered a concussion.  Saavedra was also subsequently diagnosed with an injury to his shoulder, which required surgery.  As a result of his concussion and shoulder injury, Saavedra was on medical leave from LASD for approximately one year.

After paramedics had transported Rea to the hospital, Sanchez was taken to the East Los Angeles Station and cited for driving with a suspended license.  Sanchez was held at the station for eleven to thirteen hours.  According to Sanchez, he was interrogated "against his will" while in custody.

On July 1, 2019, an autopsy was performed on Rea.  The autopsy revealed that the fatal shot entered the right side of Rea's neck.  The bullet struck the first rib, heart, left lung, aorta, and was recovered in the left hemidiaphragm.  The other shots hit Rea's elbow, forearm, and thigh.

The Los Angeles County District Attorney's Office's Justice System Integrity Division ("JSID") conducted an independent investigation and determined that Saavedra acted lawfully when he used deadly force.

## B.    Procedural History

---

[8]  Saavedra's commands to Rea were captured on cell phone video footage taken by a bystander.  In this same cell phone video footage, the sound of the gun in Rea's pant leg hitting against the pavement as his leg convulses is audible.

[9]  "417" is code for "man with a gun."

Initials of Deputy Clerk  sr

On February 21, 2020, Plaintiffs filed a Complaint.  Docket No. 1.  On April 28, 2021, Plaintiffs filed a First Amended Complaint.  Docket No. 10.  On September 7, 2020, Plaintiffs filed a Second Amended Complaint.  Docket No. 28.  On October 23, 2020, Plaintiffs filed the operative Third Amended Complaint, alleging claims for relief for: (1) unreasonable search and seizure (42 U.S.C. § 1983) (alleged against Saavedra, Huerta, and Michelle Sanchez); (2) municipal liability for unconstitutional practices (42 U.S.C. § 1983) (alleged against the County and LASD); (3) supervisory liability for ratification and failure to train, supervise, and discipline (42 U.S.C. § 1983) (alleged against Villanueva); (4) interference with familial integrity (42 U.S.C. § 1983) (alleged against Saavedra, Villanueva, the County and LASD); (5) substantive due process violation (42 U.S.C. § 1983) (alleged against Michelle Sanchez); (6) negligent hiring, training, supervision, and retention (alleged against the County); (7) assault and battery (alleged against Saavedra, Huerta, the County and LASD); (8) wrongful death (alleged against Saavedra, the County, and LASD); (9) survivorship (alleged against Saavedra, the County and LASD); (10) false imprisonment (alleged against Saavedra, Huerta, Michelle Sanchez, and the County); and (11) civil rights violations (California Civil Code § 52.1) ("Bane Act") (alleged against Saavedra, Huerta, Michelle Sanchez, the County, and LASD).  Docket No. 43.

On November 25, 2020, the Court entered an Order dismissing Michelle Sanchez from this action pursuant to a Stipulation, which stated that "[t]he parties have agreed that Plaintiff Jaylene Rea will dismiss . . . with prejudice . . . the First, Fifth, Tenth and Eleventh Claim[s] for Relief, as against Defendant Michelle Sanchez."  November 24, 2020 Joint Stipulation Regarding Dismissal of Defendant Michelle Sanchez.  *See* Docket Nos. 55 and 57.

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party meets its burden, a party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must set out specific facts showing a genuine issue for trial.  *Id.* at 250; Fed. R. Civ. P. 56(c), (e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.").  In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case."  *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party.  *Anderson*, 477 U.S. at 248.  "This requires evidence, not speculation."  *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999).  The Court must assume the truth of direct evidence set forth by the opposing party.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).  However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom.  *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d

Initials of Deputy Clerk _sr_

626, 631-32 (9th Cir. 1987).  Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *American International Group*, 926 F.2d at 836-37.  In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'"  *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

## III.    Discussion

In the Motion, Defendants move for summary judgment as to Plaintiffs' entire Third Amended Complaint as to all the remaining Plaintiffs.  However, Plaintiffs have agreed to dismiss or have abandoned several of those claims.  Pursuant to the Joint Statement Regarding Rule 7-3 Conference (filed 8/17/21; Docket No. 75), Plaintiffs agreed to dismiss their second claim for relief for municipal liability for unconstitutional practices (42 U.S.C. § 1983) and their third claim for relief for supervisory liability for ratification and failure to train, supervise, and discipline (42 U.S.C. § 1983).  In their Opposition, Plaintiffs also agreed to dismiss their sixth claim for relief for negligent hiring, training, supervision, and retention, and Jaylene agreed to dismiss her fifth claim for relief for substantive due process violation (42 U.S.C. § 1983) and seventh claim for relief for assault and battery.[10]  Opposition, 3:19-23.  In addition, Jaylene did not oppose and, thus, concedes Defendants' arguments with respect to her tenth claim for relief for false imprisonment and eleventh claim for relief for violation of the Bane Act.[11]  *See Ramirez v. Ghilotti Bros. Inc.*, 941 F.Supp. 2d 1197 (holding that argument was conceded where the defendant failed to address it in its opposition); *see also, Qureshi v. Countrywide Home Loans, Inc.*, 2010 WL 841669, *6 n. 2 (N.D. Cal. Mar. 10, 2010) (holding that plaintiff's failure to address in opposition brief claims challenged in a motion to dismiss, an "abandonment of those claims") (*citing Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n. 4 (9th Cir. 2005)); *Sportscare of America, P.C. v. Multiplan, Inc.*, 2011 WL 589955, *1 (D.N.J. Feb. 10, 2011) ("In most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue."); *Scott v. City of Phoenix*, 2011 WL 3159166, *10 (D.Ariz. Jul. 26, 2011) (holding that failure to oppose statute of limitations argument constituted waiver); *Foster v. City of Fresno*, 392 F.Supp.2d 1140, 1147 n. 7 (E.D. Cal.2005) ("At any rate, failure of a party to address a claim in an opposition to a motion for summary judgment may constitute a waiver of that claim."); *In re Online DVD Rental Antitrust Litig.*, 2011 WL 5883772, at *12 (N.D. Cal. Nov. 23, 2011) (holding that, absent unusual circumstances, failure to respond to argument on merits "viewed as grounds for waiver or concession of the argument").  As a result, all claims alleged by Jaylene in this case have been resolved.

In light of Plaintiffs' dismissals and concessions, the remaining claims in this action are:

---

[10]  Although Jaylene agreed to dismiss her claim for assault and battery, Rea and Sanchez also alleged claims for assault and battery, which are part of the seventh claim for relief.

[11]  Although Jaylene conceded her claim for false imprisonment, Sanchez also alleged a claim for false imprisonment, which is part of the tenth claim for relief.  Similarly, although Jaylene conceded her claim for violation of the Bane Act, Rea and Sanchez also alleged claims for violation of the Bane Act, which are part of the eleventh claim for relief.

Initials of Deputy Clerk  _sr_

(1) the federal claims related to the death of Rea – the first claim for relief alleging a violation of Rea's Fourth Amendment right to be free from excessive force and the fourth claim for relief alleging a violation of Garcia's Fourteenth Amendment right to familial association[12];

(2) the state law claims related to the death of Rea – the seventh claim for relief for assault and battery, the eighth claim for relief for wrongful death, the ninth claim for relief for survivorship, and eleventh claim for relief for violation of the Bane Act;

(3) the federal claim related to Sanchez's detention – the first claim for relief alleging a violation of Sanchez's Fourth Amendment right to be free from unreasonable search and seizure; and

(4) the state law claims related to Sanchez's detention – the seventh claim for relief for assault and battery, the tenth claim for relief for false imprisonment, and the eleventh claim for relief for violation of the Bane Act.

With respect to those Plaintiffs' remaining claims, Defendants move for summary judgment on the following grounds: (1) Saavedra is entitled to summary judgment on the first claim for relief alleging a violation of Rea's Fourth Amendment right to be free from excessive force because Saavedra's conduct was reasonable under the totality of the circumstances and Saavedra is entitled to qualified immunity because he did not violate a statutory or constitutional right that was clearly established at the time; and (2) Saavedra is entitled to summary judgment on the fourth claim for relief alleging a violation of Garcia's Fourteenth Amendment right to be free from interference with familial integrity because there is no underlying substantive due process violation and there is no evidence that Saavedra's intent to harm Rea was unrelated to a legitimate law enforcement objective; and (3) Huerta is entitled to summary judgment on the first claim for relief alleging a violation of Sanchez's Fourth Amendment right to be free from unreasonable search and seizure because Huerta's conduct was reasonable under the totality of the circumstances and Huerta is entitled to qualified immunity because she did not violate a statutory or constitutional right that was clearly established at the time.  Defendants also move for summary judgment on all of Plaintiffs' remaining state law claims.

### A.    The Legal Standard for Section 1983 Claims

Plaintiffs allege violations of Section 1983.  It is well established that Section 1983 itself creates no substantive rights, and that it merely provides a remedy for deprivation of federal rights established elsewhere.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985).  "The elements of a section 1983 action are: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States."  *Alford v. Haner*, 333 F.3d 972, 975-76 (9th Cir. 2003) (citation and internal quotation marks omitted).  With respect to the first element, it is undisputed that Saavedra and Huerta were acting under color of state law.  With respect to the second element, Rea and Garcia allege that Saavedra violated Rea's Fourth Amendment right to be free from excessive force and Garcia's Fourteenth Amendment due process

---

[12]  The terms "familial association" and "familial integrity" are interchangeable.

Initials of Deputy Clerk  _sr_

rights to familial association by shooting and killing Rea.  In addition, Sanchez alleges that Huerta violated his right to be free from unreasonable search and seizure.

### 1.   Legal Standard for Qualified Immunity.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Messerschmidt v. Millender*, 565 U.S. 535 (2012) (holding that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law") (internal quotations omitted).  In *Saucier v. Katz*, the Supreme Court established a two-step sequence for determining whether qualified immunity attaches to specific circumstances.  *See Saucier v. Katz*, 533 U.S. 194 (2001).  First, the Court must determine based on the facts "[t]aken in the light most favorable to the party asserting the injury," whether "the officer's conduct violated a constitutional right."  *Id.* at 201.   Second, if the plaintiff satisfies this first step, the Court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct.  *Id.*

Although the determination of qualified immunity requires a two-step analysis, as the Ninth Circuit has held that "[t]hese two prongs of the analysis need not be considered in any particular order, and both prongs must be satisfied for a plaintiff to overcome a qualified immunity defense. *Shafer v. County of Santa Barbara*, 868 F.3d 1110 (9th Cir. 2017) (*citing Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 201.  This is an "objective but fact-specific inquiry." *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007).  "I[f] officers of reasonable competence could disagree on [the] issue, immunity should be recognized."  *Fogel v. Collins*, 531 F.3d 824, 833 (9th Cir. 2008) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

### 2.   Whether a Right is Clearly Established is a Particularized Inquiry.

In the recent case of *City of Escondido, California v. Emmons*, 586 U.S. __, 139 S.Ct. 500, 503 (2019), the Supreme Court once again emphasized that:

Under our cases, the clearly established right must be defined with specificity.  "This Court has repeatedly told courts . . . not to define clearly established law at a high level of generality."  *Kisela*, 584 U.S., at ___, 138 S.Ct., at 1152 (internal quotation marks omitted).  That is particularly important in excessive force cases, as we have explained:

"Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the

Initials of Deputy Clerk __sr__

specific facts at issue . . .

> "[I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness.  An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Id.*, at ___, 138 S.Ct., at 1153 (quotation altered).

Similarly, in the case of *White v. Pauly*, 580 U.S. ___, 137 S.Ct. 548, 552 (2017) (per curiam), the Supreme Court held that "it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'"  Moreover, the Supreme Court held that "[a]s this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case."  *Id.*  Indeed, the Supreme Court has "repeatedly told courts – and the Ninth Circuit in particular – not to define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation omitted), but to consider "whether the violative nature of particular conduct is clearly established."  *Id.* at 742; *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (holding that the relevant inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition") (quotation marks omitted).  Although the law "do[es] not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741; *see also Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (per curiam) ("Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law") (quotation marks omitted); *Saucier,* 533 U.S. at 202 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate"); *see also Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003) (In performing the second step of the *Saucier* analysis, the Court must consider the "the reasonableness of the officer's belief in the *legality* of his actions.  Even if his actions did violate the Fourth Amendment, a reasonable but mistaken belief that his conduct was lawful would result in the grant of qualified immunity.").

In addition, the Ninth Circuit explained in *Sharp v. County of Orange*, 871 F.3d 901 (9th Cir. 2017), the importance of specificity in the Fourth Amendment context:

> Except in the rare case of an "obvious" instance of constitutional misconduct (which is not presented here), Plaintiffs must "*identify a case* where an officer acting under similar circumstances as [defendants] was held to have violated the Fourth Amendment."  *White v. Pauly*, ―― U.S. ――, 137 S.Ct. 548, 552 (2017) (per curiam) (emphasis added).  In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful.  To achieve that kind of notice, the prior precedent must be "controlling" – from the Ninth Circuit or Supreme Court – or otherwise be embraced by a "consensus" of courts outside the relevant jurisdiction. *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  Under the Fourth

Initials of Deputy Clerk _sr_

Amendment, police may use only such force in the course of detention or arrest as is objectively reasonable under the circumstances, and may use deadly force only in response to a threat of deadly force to either the police officer or to others.  *See Graham v. Connor*, 490 U.S. 386, 394-395 (1989); *see, also Long v. City and County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (using standard set forth in *Graham* to affirm granting of summary judgment in Fourth Amendment deadly force case).  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.  This determination "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.

Determining whether a police officer's use of force was reasonable or excessive requires balancing the "nature and quality of the intrusion " on a person's individual liberty with the "countervailing governmental interests at stake."  *Id.* at 396; *see also Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) ("'The essence of the *Graham* objective reasonableness analysis' is that '[t]he force which [i]s applied must be balanced against he need for that force: it is the need for force which is at the heart of the *Graham* factors.'") (quoting *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997)).  This includes balancing such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  The question is not whether other or lessor amounts of force could have been used, but only whether the force actually used was reasonable under the circumstances.  *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994).

**B.      Rea's Fourth Amendment Claim Against Saavedra**

The first claim for relief alleges that Saavedra violated Rea's Fourth Amendment right to be free from excessive force by shooting and killing Rea without justification.  In the Motion, Saavedra moves for summary judgment on Rea's Fourth Amendment claim on the grounds that Saavedra did not use excessive force and that he is entitled to qualified immunity.  Specifically, Saavedra argues that the force used on Rea was necessary and objectively reasonable under the totality of the circumstances.  Saavedra also argues that even if the force used could be considered excessive, Saavedra is entitled to qualified immunity because a reasonable officer in the position of Saavedra would not have known that his actions violated a clearly established right.

**1.      Saavedra Did Not Violate Rea's Fourth Amendment rights.**

When viewed in the light most favorable to Rea, the evidence in this case establishes that Saavedra had ample probable cause to believe that Rea posed an immediate threat of serious bodily injury or death to himself.  *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.  Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible,

Initials of Deputy Clerk _sr_

some warning has been given").  The undisputed facts demonstrate that Rea turned a routine traffic stop into a dangerous and rapidly escalating situation when he suddenly and without warning or provocation turned and punched Saavedra two times in the left temple with such force that his knees buckled, his neck cracked, his vision blurred, resulting in Saavedra suffering a concussion. The undisputed facts also demonstrate that when Saavedra placed Rea in a bear hug, he felt a gun in Rea's front waistband – a gun that was subsequently recovered from Rea's pant leg – and attempted to remove the gun from Rea's waistband.  After Rea prevented Saavedra from removing the gun, Rea escaped from the bear hug.  At that moment, Rea turned towards Saavedra and reached for his waistband, resulting in Saavedra's belief that Rea was reaching for his gun. According to Saavedra, if Rea was able to draw his weapon, "I thought he was going to shoot me and, due to his proximity, knew that if he shot me I would be killed."  Declaration of Deputy Hector Saavedra (Docket No. 77), ¶ 10.  As a result, Saavedra made a split second decision to fire his weapon at Rea in order to "defend my life."  *Id.*  These life threatening events unfolded in mere seconds, with Saavedra firing the four shots in less than one second.  Based on Rea's violent unprovoked assault and battery of Saavedra, Saavedra's knowledge that Rea had a gun, and Saavedra's reasonable belief that Rea was reaching for that gun, Rea posed an immediate threat to the life of Saavedra.  *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)("The 'most important' factor under Graham is whether the suspect posed an immediate threat to the safety of the officers or others."); *see also Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011); *Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004).

Indeed, an officer's use of deadly force is constitutional if the suspect threatens the officer with a weapon or "the officer has probable cause to believe that the suspect poses a significant threat of serious physical harm, either to the officer or to others."  *Garner*, 471 U.S. at 11-12; *Hayes v. County of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013).  The Supreme Court has repeatedly held that officers who use deadly force when faced with a threat of serious injury or death do not violate the Fourth Amendment, even if the threat is not specific or imminent.  *See, e.g., Plumhoff v. Rickard*, 572 U.S. 765, 776-77 (2014) (holding that officers did not violate the Fourth Amendment when they fired fifteen shots at a fleeing suspect even though a collision had brought the high-speed chase "temporarily to a near standstill" because at the time of the shooting, "all that a reasonable police officer could have concluded was that [the suspect] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road");  *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) ("[J]udges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation").  The Supreme Court has acknowledged that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396 (holding that not every use of force by police officers "even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment) (internal quotations and citations omitted); *Sheehan*, 575 U.S. at 612 ("The Constitution is not blind to the fact that police officers are often forced to make split-second judgments") (internal quotations and citations omitted).  In addition, the Ninth Circuit recently found that police officers' use of deadly force was reasonable where those officers faced an "immediate threat of significant physical harm" when Monzon, an individual fleeing from the police, accelerated the van he was driving in the direction of the police officers.  *Monzon v. City of Murrieta*, 978 F.3d 1150 (9th Cir. 2020) ("The use of deadly force here, although tragic, was not unreasonable").  The police officers fired at the van as it moved towards them and once the van crashed into a police cruiser, the officers continued firing.  The Ninth Circuit affirmed the district's granting of summary judgment on the Fourth Amendment excessive force

Initials of Deputy Clerk _sr_

claim, and held that:

> Monzon's driving endangered the officers and left them with only seconds to consider less severe alternatives.  Judges and lawyers viewing an event like this in hindsight from the comfort of their armchairs are often tempted to dissect, evaluate, and second-guess the officers' actions piecemeal.  That would be a serious mistake.  Cherry-picking specific facts in hindsight is not at all reflective of how this event transpired in real life.  It all happened in less time than it took to type this sentence, before daylight, in a very dynamic and chaotic environment, where officers were forced to make split-second decisions about a driver who deliberately turned his car around and drove it toward and between them.  The officers were faced with a reckless driver who had already endangered their lives and the lives of the public with a high-speed chase, had broken traffic laws, ignored commands to stop his vehicle, and steered and accelerated his van toward them in close quarters on an unlit street.  Although we must read the record in the light most favorable to the plaintiffs, we do not – indeed, we cannot – dissect the record in a way that ignores the totality of the dynamic and quickly changing circumstances Monzon created by deliberately turning his car around and driving it toward and between five officers.

*Id.* at 1157-58

Considered in light of Supreme Court and Ninth Circuit precedent, and bearing in mind "the broad discretion that must be afforded to police officers who face a tense situation" (*Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001)), and that reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" (*Graham*, 490 U.S. at 306), a reasonable officer in Saavedra's position, who had to make life or death decisions in a tense, dangerous, and rapidly changing situation, would have believed that Rea posed an immediate threat of serious harm under the circumstances of this case, including Rea's violent assault and battery of Saavedra, Saavedra's knowledge that Rea had a weapon, and Saavedra's reasonable belief that Rea was reaching for that weapon.  *Wilkinson*, 610 F.3d at 551 ("A reasonable use of deadly force encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable"); *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996) ("[T]he Fourth Amendment does not require omniscience . . . Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm – the Constitution does not require that certitude precede the act of self protection").

Therefore, viewing the facts in the light most favorable to Rea, the Court concludes that Saavedra did not violate Rea's Fourth Amendment rights.  Accordingly, the Motion is granted with respect to Rea's first claim for relief alleging a violation of his Fourth Amendment rights.

### 2.    Saavedra Did Not Violate Clearly Established Law.

Because the Court concludes that Rea's Fourth Amendment rights were not violated by Saavedra, the Court need not reach the second step of the *Saucier* analysis.  *See, e.g., Johnson v. County of Los Angeles*, 340 F.3d 787, 793-94 (9th Cir. 2003).  However, even assuming that the Court had found that Saavedra's conduct constituted a constitutional violation, Saavedra would still be entitled to summary judgment on Rea's claim that his Fourth Amendment rights were violated on

the grounds of qualified immunity.

In this case, viewing the evidence in the light most favorable to Rea, the Court concludes that Saavedra is entitled to qualified immunity because it was not clearly established that Saavedra's use of force under these particular circumstances would be a violation of Rea's Fourth Amendment rights. From Saavedra's perspective and knowledge of the situation, Saavedra was confronted with a rapidly unfolding situation that included an armed suspect who had punched Saavedra with such force that it caused his knees to buckle, his neck to crack, and his vision to blur. Indeed, after Saavedra was examined at the hospital, doctors concluded that Saavedra had suffered a concussion from Rea's blows to his head. As a result, at the time Saavedra was required to make a split second decision to fire his weapon, Rea had just violently assaulted Saavedra, was in possession of a gun, and Saavedra reasonably believed that Rea was reaching for and would use that gun to kill Saavedra. Specifically, Saavedra testified that if Rea was able to draw his weapon, "I thought he was going to shoot me and, due to his proximity, knew that if he shot me I would be killed." Recent cases have found law enforcement officers entitled to qualified immunity in cases involving far less dangerous situations than the situation faced by Saavedra. *See, e.g., Kisela v. Hughes*, 584 U.S. __, 138 S. Ct. 1148, 1153-54 (2018) (holding that qualified immunity barred liability where officers shot a woman holding a knife, believing she was a threat to a woman standing near her); *Reese*, 888 F.3d at 1038 (holding that qualified immunity barred liability where an officer shot a suspect who came to the door wielding a knife, backed away when fired upon and then stood in a position where the officer could not see his hands); *Isayeva v. Sacramento Sheriff's Dept.*, 872 F.3d 938, 950-52 (9th Cir. 2017) (holding that qualified immunity barred liability where an officer shot and killed a man he was trying to detain for a mental health evaluation after the man punched and pushed two officers); *S.B. v. County of San Diego*, 864 F.3d 1010, 1016-17 (9th Cir. 2017) (holding that qualified immunity barred liability where an officer shot an inebriated individual who carried knives). For example, in *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004), the Supreme Court held that the officer was entitled to qualified immunity when she shot the suspect from behind as he was driving away to protect "other officers who [she] believed were in the immediate area" and "any other citizens who might be in the area. *Id.; see also* P*lumhoff*, 572 U.S. at 780 (holding that the officer was entitled to qualified immunity even though the driver "had just begun to flee and . . . had not yet driven his car in a dangerous manner"). In addition, in *Dew v. City of Seaside*, 2021 WL 1749898 (N.D. Cal. May 4, 2021), the court concluded that the officer was entitled to qualified immunity on the decedent's Fourth Amendment excessive force claim where the officer believed the decedent was reaching for a gun, even though it was later determined that the decedent was unarmed. Similarly, in *Day v. County of Contra Costa*, 2008 WL 4858472 (N.D. Cal. Nov. 10, 2008), the court determined that the officer was entitled to qualified immunity on the decedent's Fourth Amendment excessive force claim where the decedent had punched the officer in the head several times and the officer did not know whether the decedent had a weapon. *See also Pickard v. Holton*, 2015 WL 576717 (N.D. Cal. Feb. 11, 2015) (holding that the officer was entitled to qualified immunity after shooting the decedent who was running away while reaching into his waistband for his weapon). Therefore, a reasonable law enforcement officer would not have known that shooting a suspect in this situation was unreasonable.

In addition, none of the cases cited by Rea are sufficiently similar to the facts of this case such that they would have alerted Saavedra that his conduct was unlawful. The cases relied on by Rea mainly involve situations in which a law enforcement officer was found to have used excessive force in shooting an unarmed individual. For example, in *Estate of Elkins v. Pelayo*, 737 Fed. App'x

830 (9th Cir. 2018), the officers shot the decedent, who was unarmed and who officers did not have any reason to think was armed, in the back as he was running away.  Similarly, in *Cruz v. City of Alhambra*, 765 F3d 1076 (9th Cir. 2014), after a vehicle pursuant, the officers shot the decedent after he had stopped his car, opened his door, officers shouted at him to get on the ground, and the officers thought he was reaching for his waistband.  Although a gun was subsequently recovered from the passenger side door, the decedent was not armed or have a weapon in close proximity to him.  *Id.*  In addition, unlike this case, the decedent did not assault any of the officers and was not in close physical proximity to any of the officers.  *Id.*  Thus, the cases cited by Rea are distinguishable and do not preclude qualified immunity.

The Court concludes that Saavedra has demonstrated that the constitutional right at issue was not clearly established such that a reasonable law enforcement officer would have known that his challenged conduct was unlawful.  Based on the undisputed facts, which are viewed in the light most favorable to Rea, a reasonable officer would not have known that firing his weapon at Rea after he had been assaulted and saw Rea reaching for his gun in his waistband would be unlawful at the time of the incident.  Therefore, the Court concludes that, under the second step of the *Saucier* qualified immunity analysis, a reasonable officer in Saavedra's position would not have known that the force used in this case violated a clearly established right.

In addition, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," and the Court finds that Saavedra reasonably could have believed that his conduct was lawful under the circumstances.  *Id.*; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Therefore, Saavedra is entitled to qualified immunity on Rea's Fourth Amendment claim.  Accordingly, the Motion is granted with respect to Rea's first claim for relief alleging a violation of his Fourth Amendment rights.

## C.    Garcia's Fourteenth Amendment Right to Familial Association Claim

The fourth claim for relief alleges that Saavedra[13] violated Garcia's Fourteenth Amendment right to a familial relationship with Rea because Rea's death was proximately caused by Saavedra's use of excessive force.  In the Motion, Saavedra moves for summary judgment on Garcia's Fourteenth Amendment claim on the grounds that Saavedra did not violate Garcia's Fourteenth Amendment rights and even if his conduct did violate Garcia's Fourteenth Amendment rights, he is entitled to qualified immunity.

In this case, because the Court has concluded that Saavedra is entitled to summary

---

[13]  The fourth claim for relief alleging a violation of Garcia's Fourteenth Amendment rights is alleged against Saavedra, Villanueva, the County and LASD.  However, the facts alleged in the fourth claim for relief only relate to Saavedra's purported use of excessive force resulting in Rea's death and there are no facts alleged that would support a Fourteenth Amendment claims against Villanueva, the County, or LASD.  Accordingly, Villanueva, the County, and LASD are entitled to summary judgment on Garcia's Fourteenth Amendment claim for the same reasons as Saavedra, which are discussed below.

Initials of Deputy Clerk  _sr_

judgment in his favor on Rea's Fourth Amendment excessive force claim alleged the first claim for relief, Saavedra is entitled to summary judgment on Garcia's Fourteenth Amendment claim alleged in the fourth cause of action because there is no underlying constitutional violation to support the Fourteenth Amendment right to familial association claim.  *See, e.g., Schwarz v. Lassen Cty. ex rel. Lassen Cty. Jail*, 628 F. App'x 527, 528 (9th Cir. 2016) ("Recovery for a violation of the right to familial association is generally contingent on the existence of an underlying constitutional violation."); *Gausvik v. Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004) ("Since the claim of familial interference is directly related to all the other constitutional claims . . ., the other claims form an integral part of the claim relating to familial interference.").

However, even if Rea could survive summary judgment on his Fourth Amendment excessive force claim, Saavedra would still be entitled to summary judgment on Garcia's Fourteenth Amendment right to familial association claim for the reasons detailed below.

> **1.      Saavedra did not Violate Garcia's Fourteenth Amendment Right to Familial Association.**

In *Porter*, the Ninth Circuit "clarif[ied] the standard of culpability" for Fourteenth Amendment due process right to familial association claims in a case brought by the parents of a motorist who was shot and killed by a state highway patrol officer during a suspicious vehicle investigation:

> The parties mistakenly suggest that the choice is between "shocks the conscience" and "deliberate indifference" as the governing standard, when in fact the latter is one subset of the former.  The Supreme Court has made it clear, as the district court correctly recognized, that only official conduct that "shocks the conscience" is cognizable as a due process violation.  *Lewis*, 523 U.S. at 846, 118 S.Ct. 1708 (*citing Rochin v. California*, 342 U.S. 165, 172-73, 72 S.Ct. 205, 96 L.Ed. 183 (1952)).  The relevant question on the facts here is whether the shocks the conscience standard is met by showing that Trooper Osborn acted with deliberate indifference or requires a more demanding showing that he acted with a purpose to harm Casey for reasons unrelated to legitimate law enforcement objectives.  *See id.* at 836, 118 S.Ct. 1708.  In our cases following the Supreme Court's enunciation of the shocks the conscience test in *Lewis*, we have distinguished the "purpose to harm" standard from the "deliberate indifference" standard, recognizing that the overarching test under either is whether the officer's conduct "shocks the conscience."  *See, e.g., Moreland*, 159 F.3d at 372.

*Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (concluding that officer was entitled to qualified immunity and finding that the plaintiffs would have to demonstrate that the officer acted with a purpose to harm their son "that was unrelated to legitimate law enforcement objectives").

The appropriate standard of culpability depends on the type of situation a defendant finds himself in at the time of the challenged action.  If a defendant finds himself in a situation where "actual deliberation is practical," then his deliberate indifference to the harm he caused may be sufficient to shock the conscience.  *Hayes*, 736 F.3d at 1230.  However, if a defendant was forced to make a "snap judgment because of an escalating situation," then his conduct will not shock the conscience unless he "act[ed] with a purpose to harm unrelated to legitimate law enforcement

Initials of Deputy Clerk _sr_

objectives.  *Id.*; *see also Barnes v. City of Pasadena,* 508 Fed. App'x 663, 665 (9th Cir. 2013) ("Actual deliberation by the officers was not practical because the incident rapidly escalated into a physical struggle and a fatal shooting, and it lasted only about twenty-five seconds."); *Estate of Lopez v. Gelhaus*, 149 F. Supp. 3d 1154, 1165-66 (N.D. Cal. 2016) (granting summary judgment on substantive due process claim because there was no time to deliberate and no evidence that officer acted with improper purpose).

In addition, to satisfy the purpose-to-harm standard, a plaintiff must have concrete, non-speculative evidence that demonstrates an officer's motive was improper.  *Jeffers v. Gomez*, 267 F.3d 895, 907 (9th Cir. 2001) (holding that the plaintiff must do more than simply allege that the defendants acted with an improper motive in order to survive summary judgment).  Without specific evidence showing an intent to harm the decedent unrelated to legitimate law enforcement objectives, a Fourteenth Amendment claim for right of familial association fails as a matter of law.  *See Estate of Montanez v. City of Indio*, 2018 WL 1989533, at *10 (C.D. Cal. Apr. 25, 2018) (granting summary judgment on familial integrity claim because the officers' decision to use their weapons in a "quickly-evolving situation" did not shock the conscience); *see also Estate of Najera v. City of Anaheim*, 2017 WL 10544043, at *6 (C.D. Cal. July 10, 2017) (granting summary judgment on substantive due process claim).

In this case, the Court concludes, and Garcia concedes, that the "purpose to harm" standard applies.  Rea escalated the traffic stop into a dangerous and rapidly escalating situation by turning around suddenly and violently punching Saavedra in the left temple without warning.  Within mere seconds, Saavedra was assaulted, discovered that Rea had a gun in his waistband, and saw Rea reach for the gun in his waistband while Rea was approximately two feet away.  As a result, Saavedra had no time to deliberate as he was required to make "repeated split-second decisions" during a "quickly evolving and escalating" situation that lasted only a few seconds.  See *Porter*, 546 F.3d at 1139 (holding that deliberation was not practical during a five-minute altercation where officers were required to make "repeated split-second decisions").  The Court concludes that Garcia has failed to demonstrate that Saavedra intended to harm Rea for a reason unrelated to a legitimate law enforcement objective, specifically attempting to save his life.  *Estate of Montanez*, 2018 WL 1989533, at *10 (holding that "without specific evidence showing an actual intent to harm Montanez unrelated to legitimate law enforcement objectives, Plaintiffs' Fourteenth Amendment claim fails").  Although Garcia argues that Saavedra's intent to harm Rea is demonstrated because Saavedra fatally shot Rea, who was unarmed and significantly smaller in statute than Saavedra, Garcia has offered no evidence to demonstrate that Rea was unarmed.  Indeed, the undisputed evidence demonstrates that Rea violently assaulted Saavedra, Rea was armed, and Rea was reaching for his gun when Saavedra shot him.  Similarly, Garcia argues that Saavedra's intent to harm Rea is demonstrated because Saavedra shot Rea in the neck "as he laid on the ground after having been shot at three times."  However, the evidence demonstrates that the four shots fired by Saavedra at Rea were all fired in less than one second and although Rea may have been struck by the last shot as he was falling to the ground, Rea was not shot "as he laid on the ground."

Therefore, viewing the facts in the light most favorable to Garcia, the Court finds that Saavedra did not violate Garcia's Fourteenth Amendment rights.   Accordingly, Garcia is entitled to summary judgment on Garcia's fourth claim for relief alleging a violation of Garcia's Fourteenth Amendment rights.

**2.      Saavedra Did Not Violate Clearly Established Law.**

Initials of Deputy Clerk  _sr_

Because the Court concludes that Garcia's Fourteenth Amendment rights to familial association were not violated by Saavedra, the Court need not reach the second step of the *Saucier* analysis.  *See, e.g., Johnson v. County of Los Angeles*, 340 F.3d 787, 793-94 (9th Cir. 2003).  However, even assuming that the Court had found that Saavedra's conduct constituted a constitutional violation, Saavedra would still be entitled to summary judgment on Garcia's Fourteenth Amendment claim on the grounds of qualified immunity.

In this case, viewing the evidence in the light most favorable to Garcia, the Court concludes that Saavedra is entitled to qualified immunity because it was not clearly established that Saavedra's use of force under these particular circumstances was a violation of Garcia's Fourteenth Amendment rights.

In addition, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," and the Court finds that Saavedra reasonably could have believed that his conduct was lawful under the circumstances.  *Id.*; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Therefore, Saavedra is entitled to qualified immunity on Garcia's Fourteenth Amendment claim.  Accordingly, the Motion is granted with respect to Garcia's fourth claim for relief alleging a violation of Garcia's Fourteenth Amendment rights.

**D.      Sanchez's Fourth Amendment Claim Against Huerta**

In the first claim for relief, Sanchez alleges that Huerta violated his Fourth Amendment right to be free of unreasonable search and seizure by conducting an unlawful stop of the car he was driving, handcuffing him, and placing him in the back of a patrol car despite knowing that probable cause did not exist to justify his detention.[14]  In the Motion, Huerta moves for summary judgment on the grounds that Huerta did not violate Sanchez's Fourth Amendment rights and even if Huerta's conduct did violate Sanchez's Fourth Amendment rights, she is entitled to qualified immunity.

**1.      Huerta Did Not Violate Sanchez's Fourth Amendment Rights.**

The Ninth Circuit has repeatedly held that "the Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops."  *United States v. Dorais*, 241 F.3d 1124, 1130 (9th Cir. 2001) (citation omitted).  "Reasonable suspicion is formed by 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'"  *Id.* (citation omitted).  In addition, even if an officer makes a mistake of fact, a stop is still not illegal if the officer had

---

[14]  Sanchez also alleges that he was taken to the East Los Angeles Station and held in custody for eleven to thirteen hours and interrogated against his will.  However, Huerta was not responsible for or in any way involved in Sanchez's custodial interrogation.  After Huerta left LAC + USC Medical Center, she was taken to the East Los Angeles Station and questioned by two Homicide Bureau detectives, Sergeant Marvin Jaramilla and Sergeant Marcelo Quintero, at approximately 4:36 a.m. to 5:18 a.m., on June 28, 2019, and there is no evidence that she had any contact with Sanchez at the station.

Initials of Deputy Clerk  _sr_

reasonable suspicion to stop the car.  *See, e.g.*, *Dorais*, 241 F.3d at 1131 (holding that ultimate determination that a car was not stolen did not make stop to investigate improper); *United States v. Wallace*, 213 F.3d 1216, 1220-21 (9th Cir. 2000) (holding that the officer had reasonable suspicion to stop a car with tinted windows, even though it was later established that the windows did not violate the law).  Moreover, the totality of the circumstances are considered in evaluating whether there was reasonable suspicion. *See United States v. Valdes-Vega*, 738 F.3d 1074, 1081 (9th Cir. 2013).

In this case, Huerta's decision to stop the car that Sanchez was driving was supported by ample reasonable suspicion.  *United States v. Willis*, 431 F.3d 709, 714-15 (9th Cir. 2005) (holding that court does not need to determine reasonableness of a temporary detention if there is reasonable suspicion that a traffic violation occurred).  Sanchez was speeding, had failed to stop at a stop sign, and the officers suspected he might be driving a stolen car.  After Sanchez pulled over, he refused to comply with Huerta's request to produce his driver's license.

In addition, Huerta's decision to perform a field sobriety test was supported by reasonable suspicion.  *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1207 (10th Cir. 2008) ("[Plaintiff's] statement that he 'had one beer three hours ago' provided [officer] with reasonable suspicion to conduct the field sobriety tests, or at the very least provided her with 'arguable reasonable suspicion' entitling her to qualified immunity").  As she was speaking with Sanchez, Huerta observed that his eyes were glassy and red, that he was sweating, and that he was unable to keep his hands on the steering wheel despite Huerta's several commands to keep his hand on the steering wheel.  The officers smelled burnt marijuana, and Sanchez admitted that he had just stopped at a marijuana dispensary and purchased marijuana.  Sanchez also acknowledged that he had recently smoked marijuana.  Because Huerta was going to administer a field sobriety test, she asked Sanchez to step out of the vehicle and patted him down, handcuffed him, and placed him in the patrol vehicle in order to secure the scene before she administered the field sobriety test.

Moreover, the fact that Sanchez was ultimately only charged with driving with a suspended license, is irrelevant to determining if Huerta had reasonable suspicion to conduct the traffic stop and administer the field sobriety test.  *Willis*, 431 F.3d at 715 (holding that it is immaterial that the "ultimate charge was not related to the traffic stop").  Indeed, Huerta was unable to complete her investigation because Rea suddenly and dramatically changed a routine traffic stop into a life threatening assault and shooting incident.  *Id.* at 717 (holding that "it was reasonable for the officers to view any traffic violations as inconsequential in light of [the suspect's] arrest.  *Whren* and *Lopez-Soto* require that the officers have reasonable suspicion to stop a driver for traffic infractions, not that the officers issue citations").

Finally, Sanchez's argument that Huerta threatened him and "forced" him out of his car was totally contradicted by his deposition testimony when he explained that "forced" meant "[s]he had opened the door, so I kind of had no choice but to get out the – out of the vehicle."  The Supreme Court "has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham*, 490 U.S. at 396; *see also Smith v. City of Stockton*, 818 F. App'x 697, 699 (9th Cir. 2020) (holding that officer who pointed gun at plaintiff during traffic stop, a situation "especially fraught with danger," was protected by qualified immunity (citation omitted)).  In addition, Sanchez concedes that he was never hit, pushed, or otherwise physically harmed by Huerta or any other deputy.

Initials of Deputy Clerk __sr__

Therefore, viewing the facts in the light most favorable to Sanchez, the Court finds that Huerta did not violate Sanchez's Fourth Amendment rights.  Accordingly, the Motion is granted with respect to Sanchez's first claim for relief alleging a violation of his Fourth Amendment rights.

### 2.    Huerta Did Not Violate Clearly Established Law

Because the Court concludes that Huerta did not violate Sanchez's Fourth Amendment right to be free from unreasonable search and seizure, the Court need not reach the second step of the *Saucier* analysis.  *See, e.g., Johnson v. County of Los Angeles*, 340 F.3d 787, 793-94 (9th Cir. 2003).  However, even assuming that the Court had found that Huerta's conduct constituted a constitutional violation, Huerta would still be entitled to summary judgment on Sanchez's Fourth Amendment claim on the grounds of qualified immunity.

In this case, viewing the evidence in the light most favorable to Sanchez, the Court concludes that Huerta is entitled to qualified immunity because it was not clearly established that Huerta's conduct under these particular circumstances was a violation of Sanchez's Fourth Amendment rights.  Indeed, Sanchez, by failing to address this issue in the Opposition, has conceded that Huerta is entitled to qualified immunity on Sanchez's Fourth Amendment claim.  In their Opposition, the entirety of Sanchez's argument with respect to Huerta's alleged violation of Sanchez's Fourth Amendment rights is as follows:

> In the present case, Deputy Huerta did not have probable cause to detain Plaintiff Tommy Sanchez.  (Facts 125-127.)  Mr. Sanchez was then taken to the station against his will and interrogated.  (Facts 129-131.)  Mr. Sanchez was released after being held in custody for 11 to 13 hours under the false pretense that he had been arrested for driving without a license.  (Facts 131.)
>
> Construing the facts and all reasonable inferences in Plaintiff Tommy Sanchez's favor, a reasonable jury could conclude that Deputy Huerta did not have probable cause to arrest Plaintiff Tommy Sanchez.  Thus, Defendants are not entitled to summary judgment on this aspect of Plaintiff Tommy Sanchez's unlawful detention claims.

Opposition, 24: 10-18; *see also* Notice of Opposition, p. 2-3 (discussing triable issues of material fact that exist as to various claims, which is devoid of any discussion of Sanchez's Fourth Amendment claim).  Because Sanchez failed to address Huerta's qualified immunity argument, they have conceded that Huerta is entitled to qualified immunity with respect to Sanchez's Fourth Amendment claim.  *See Ramirez,* 941 F.Supp. 2d 1197 (holding that argument was conceded where the defendant failed to address it in its opposition); *see also Qureshi,* 2010 WL 841669, *6 n. 2 (N.D. Cal. Mar. 10, 2010) (holding that plaintiff's failure to address in opposition brief claims challenged in a motion to dismiss, an "abandonment of those claims") (*citing Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n. 4 (9th Cir. 2005)); *Sportscare of America,* 2011 WL 589955, *1 (D.N.J. Feb. 10, 2011) ("In most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue."); *Scott,* 2011 WL 3159166, *10 (D. Ariz. Jul. 26, 2011) (holding that failure to oppose statute of limitations argument constituted waiver); *Foster,* 392 F.Supp.2d 1140, 1147 n. 7 (E.D. Cal.2005) ("At any rate, failure of a party to address a claim in an opposition to a motion for summary judgment may constitute a waiver of that claim."); *In re Online DVD Rental Antitrust Litig.,*

Initials of Deputy Clerk  sr

2011 WL 5883772, at *12 (N.D. Cal. Nov. 23, 2011) (holding that, absent unusual circumstances, failure to respond to argument on merits "viewed as grounds for waiver or concession of the argument").

In addition, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," and the Court finds that Huerta reasonably could have believed that her conduct was lawful under the circumstances. *Id.*; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Therefore, Huerta is entitled to qualified immunity on Sanchez's Fourth Amendment claim. Accordingly, the Motion is granted with respect to Sanchez's first claim for relief alleging a violation of his Fourth Amendment rights.

### E.    Plaintiffs' Remaining State Law Claims Are Dismissed.

"The district court may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 (1988). "'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state law claims.'" *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir. 2008) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 351 (1988)).

In light of the fact that the Court has granted summary judgment on the only claims over which this Court has original jurisdiction, and after considering judicial economy, convenience, fairness, and comity, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.  Indeed, although Plaintiffs' state and federal law claims are based on similar facts and theories, their state law claims cannot be easily or summarily disposed of based on the Court's ruling on the federal claims, especially because qualified immunity is not applicable to the state law claims.  In addition, the state law claims have unique elements and involve complex issues, which are more appropriately resolved by the state court.  "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  Accordingly, the balance of factors strongly favor declining to exercise jurisdiction over the remaining state law claims, and, as a result, the remaining state law claims – specifically, Rea's and Sanchez's seventh claim for relief for assault and battery, Rea's eighth claim for relief for wrongful death, Garcia's ninth claim for relief for survivorship, Sanchez's tenth claim for relief for false imprisonment, and Rea's and Sanchez's eleventh claim for relief for violation of the Bane Act – are **DISMISSED without prejudice**.

## IV.    Conclusion

Initials of Deputy Clerk  _sr_

For all the foregoing reasons, Defendants' Motion is **GRANTED** with respect to Rea's first claim alleging a violation of his Fourth Amendment rights, Sanchez's first claim for relief alleging a violation of his Fourth Amendment rights, and Garcia's fourth claim for relief alleging a violation of her Fourteenth Amendment rights.  Defendants' Motion is also **GRANTED** with respect to Jaylene's tenth claim for relief for false imprisonment and eleventh claim for relief for violation of the Bane Act.  In addition, Plaintiffs' second claim for relief for municipal liability for unconstitutional practices (42 U.S.C. § 1983), third claim for relief for supervisory liability for ratification and failure to train, supervise, and discipline (42 U.S.C. § 1983), and sixth claim for relief for negligent hiring, training, supervision, and retention are **DISMISSED with prejudice** and Jaylene's fifth claim for relief for substantive due process violation (42 U.S.C. § 1983) and seventh claim for relief is **DISMISSED with prejudice**.  Finally, the remaining state law claims are **DISMISSED without prejudice**.

The parties are ordered to meet and confer and agree on a joint proposed Judgment which is consistent with this Order.  The parties shall lodge the joint proposed Judgment with the Court on or before **October 14, 2021.**  In the unlikely event that counsel are unable to agree upon a joint proposed Judgment, the parties shall each submit separate versions of a proposed Judgment along with a Joint Statement setting forth their respective positions no later than **October 14, 2021.**

IT IS SO ORDERED.

Initials of Deputy Clerk  sr